UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| RONALD LEE, )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>UNITED STATES OF AMERICA, )<br>)<br>Respondent. ) | Case No. 10-1060 |

## **O R D E R**

This matter is now before the Court on Petitioner, Ronald Lee's ("Lee"), Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. For the reasons set forth below, the § 2255 Motion [#4] is DENIED.

### **BACKGROUND**

On November 3, 2008, Lee entered a guilty plea pursuant to a written plea agreement to charges of conspiracy to distribute and possess with intent to distribute more than 50 grams of crack cocaine in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846, and distribution of more than 5 grams of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) in the United States District Court for the Central District of Illinois. On March 6, 2009, he was sentenced to concurrent terms of 312 months' imprisonment, followed by a term of supervised release. Lee did not pursue a direct appeal.

Although he waived his right to appeal and pursue collateral relief pursuant to § 2255 in ¶¶ 13 and 14 of the written plea agreement, Lee has now filed the instant Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. In his Motion, Lee attempts to collaterally attack his conviction based on allegations that he received ineffective assistance of counsel, that his convictions violate Double Jeopardy, and that the advisory guideline calculations were improper. This Order follows.

**Discussion**

1.  Motion to Vacate, Set Aside, or Correct Sentence

A petitioner may avail himself of § 2255 relief only if he can show that there are "flaws in the conviction or sentence which are jurisdictional in nature, constitutional in magnitude or result in a complete miscarriage of justice." Boyer v. United States, 55 F.3d 296, 298 (7th Cir. 1995), *cert. denied*, 116 S.Ct. 268 (1995).  Section 2255 is limited to correcting errors that "vitiate the sentencing court's jurisdiction or are otherwise of constitutional magnitude." Guinan v. United States, 6 F.3d 468, 470 (7th Cir. 1993), *citing* Scott v. United States, 997 F.2d 340 (7th Cir. 1993).  A § 2255 motion is not, however, a substitute for a direct appeal. Doe v. United States, 51 F.3d 693, 698 (7th Cir.), *cert. denied*, 116 S. Ct. 205 (1995).

Here, Lee would appear to be barred from bringing this § 2255 motion by virtue of the fact that his plea agreement contains a waiver of his right to bring a collateral attack on his sentence.  While Lee does assert that he should be resentenced, he makes no attempt to avoid the impact of this waiver by asking the Court to vacate his guilty plea and does not present any evidence indicating that but for his counsel's ineffective assistance, he would not have entered into the plea agreement.  Perhaps this is because he believes that the plea bargain's advantages outweigh its disadvantages.  In any event, so long as the plea agreement stands, the waiver of the right to appeal or pursue collateral relief must generally be enforced.  Id., *citing* United States v. Wagner, 103 F.3d 551 (7th Cir. 1996); Jones v. United States, 167 F.3d 1142, 1144 (7th Cir. 1999); United States v. Nelson, 124 F.3d 206, 1997 WL 374712, at *1 (7th Cir. July 1, 1997).

However, this circuit has recognized that the right to pursue a collateral attack pursuant to § 2255 survives "with respect to those discrete claims which relate directly to

the negotiation of the waiver." Jones, 167 F.3d at 1144-45. Accordingly, while Lee does not contend that he received ineffective assistance of counsel in connection with the negotiation of the waiver itself, the Court will address his claim to the extent necessary to determine whether the negotiation of the various waiver provisions is implicated.

The seminal case on ineffective assistance of counsel is Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the Court stated that in order for a prisoner to demonstrate that counsel's performance fell below the constitutional standard, the petitioner would have to show that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88. A prisoner must also prove that he has been prejudiced by his counsel's representation by showing "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. The courts, however, must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 690.

To satisfy Strickland's prejudice prong in this case, Petitioner must demonstrate through objective evidence a reasonable probability that, but for counsel's purportedly erroneous advice, he would not have entered the guilty plea and would have insisted upon going to trial. United States v. Woolley, 123 F.3d 627, 635 (7th Cir. 1997). "It is far from obvious how a petitioner is expected to make such a showing, but it is clear that 'merely making such an allegation is insufficient.'" United States v. Ryan, 986 F.Supp. 509, 513 (N.D.Ill. 1997), *citing* Key, 806 F.2d at 139; *see also,* Bethel v. United States, 458 F.3d 711, 718 (7th Cir. 2006); McCleese v. United States, 75 F.3d 1174, 1179 (7th Cir. 1996) (requiring that the petitioner establish through objective evidence that he would not have accepted the plea).

Here, Lee argues that but for the purportedly misleading advice and coercion by counsel, he would have rejected the plea offer and insisted on going to trial. A review of the transcript of the plea hearing reveals that, after a detailed discussion of the maximum sentence he could face depending on the nature of any past criminal conduct, Lee received a lengthy explanation of the waiver provision and its consequences during the plea colloquy. As set forth below, this explanation was more than sufficient to remedy any misinformation (or lack of information) that may have been provided by his counsel with respect to the waiver provisions, and hence, he has failed to demonstrate actual prejudice under Strickland. This same dialogue also demonstrates the knowing and voluntary nature of Lee's waiver and guilty plea, as well as his competency.

When the Court accepted Lee' guilty plea, it held a lengthy change of plea hearing pursuant to Rule 11 of the Federal Rules of Criminal Procedure. Rule 11 "provides protection for those who voluntarily choose to waive their constitutional right to a trial by pleading guilty while ensuring an adequate record to insulate the plea from appellate and collateral attacks." Key v. United States, 806 F.2d 133, 136 (7th Cir. 1986). Rule 11 also provides for a colloquy that "exposes the defendant's state of mind in the record through personal interrogation." Id., *citing* United States v. Fountain, 777 F.2d 351, 356 (7th Cir. 1985). This aspect of the Rule 11 hearing is especially important with respect to subsequent collateral proceedings, because the representations made by the defendant during a plea colloquy, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceeding. Id., *citing* Thompson v. Wainwright, 787 F.2d 1447 (11th Cir. 1986); Blackledge v. Allison, 431 U.S. 63, 97 S.Ct. 1621, 1629 (1977). Furthermore, "[s]olemn declarations in open court carry a strong presumption of verity." Blackledge, 97 S.Ct. at 1629.

Initially, the Court notes that Lee's plea agreement contains a detailed explanation of the charges against him, the elements that must be proven at trial on each charge, and the possible penalties that he would face if convicted. Plea Agreement at ¶¶ 4-9. The agreement also sets forth an analysis of the application of the Sentencing Guidelines based on the information currently available, as well as the admonition that the sentencing calculations or recommendations of any party would not be binding on the Court at sentencing. Id., at ¶¶ 15-20. Furthermore, in signing the Plea Agreement, Lee made the following certification:

> I have read this entire plea agreement carefully and have discussed it fully with my attorney. I fully understand this agreement, and I agree to it voluntarily and of my own free will. I am pleading guilty because I am in fact guilty, and I agree that the facts stated in this agreement about my criminal conduct are true. No threats, promises, or commitments have been made to me or to anyone else, and no agreements have been reached, expressed or implied, to influence me to plead guilty other than those stated in this written plea agreement. I am satisfied with the legal services provided by my attorney. I understand that by signing below I am stating I agree with everything stated in this paragraph, and I am accepting and entering into this plea agreement.

Id., at ¶ 34.

Additionally, after a careful review of the transcript of Petitioner's Rule 11 hearing, the Court finds that he has failed to overcome the strong presumption of verity which attached to the statements of voluntariness and understanding that he made during that hearing. The pertinent portion of the record reveals the following colloquy between Lee and the Court after he was placed under oath:

Q: Now that you have been sworn, you understand that your answers to my questions are subject to the penalties of perjury or giving a false statement if you don't answer truthfully?

* * *

A: Yes.

* * *

Q: Have you been treated recently for any mental illness or addiction to narcotic drugs?

A: No, sir.

* * *

Q: Are . . . you currently under the influence of any drug, medication, or alcoholic beverage?

* * *

A: No, sir.

Q: Have . . . you received a copy of the indictment, that is the formal charges made against you?

* * *

A: Yes, sir.

Q: Have . . . you fully discussed those charges contained in your case and the case in general, including any possible defenses that you might have, with your attorney?

* * *

A: Yes, sir.

* * *

Q: Mr. Lee, are you fully satisfied with the counsel, representation, and advice given to you in this case by Mr. Taylor as your attorney?

A: Yes.

Q: As I understand it . . . your willingness to plead guilty here today is due, at least in part, to the discussions that you and your attorneys have had with the attorney for the Government leading up to the written plea agreements. Is that correct?

* * *

A: Yes, sir.

Q: Did . . . you have a reasonable opportunity to read and discuss the plea agreement with your attorney before you signed it?

* * *

A: Yes.

Q: Does the plea agreement . . . represent in its entirety every understanding that you have with the Government?

* * *

A: Yes, sir.

Q: Do . . . you understand the terms of the plea agreement?

* * *

A: Yes, sir.

* * *

Q: Mr. Lee, do you have a prior felony drug conviction?

A: No, sir.

* * *

Q: All right. Then we're looking at – at the bottom of page 4, concerning Count 1, it indicates there would be a mandatory 10 years up to life in prison, a fine of up to $4 million, supervised release term of 5 years to life and a special assessment of $100. Did you hear my explanation to him about supervised release?

A: Yes, sir.

Q: Do you understand that?

A: Yes.

Q: Then as to Count 5, with no prior felony drug conviction you're looking at a custody term of 5 years up to 40 years, a fine of up

      to $2 million, a supervised release term of 4 years to life and a $100 mandatory special assessment. If the sentences were imposed consecutively, you would be looking at 15 years to life, a fine of up to $6 million, supervised release term of 9 years to life and a $200 mandatory special assessment. Do you understand?

A:     Yes, sir.

* * *

Q:     Paragraph 13 is a waver of right of appeal from conviction and sentence. In this paragraph in each of these agreements you're giving up the right to file a notice of appeal following your sentence if you're not happy with your sentence with two very narrow exceptions. One: If the Court were to impose a sentence beyond the statutory maximum provided by law. And two: You could appeal claiming that your attorney had not effectively represented you concerning the negotiation of this plea agreement. But in all other respects, you're waiving your right to appeal. Do each of you understand the very broad nature of that waiver?

* * *

A:     Yes, sir.

Q:     Do you have any questions about that?

* * *

A:     No.

Q:     The next paragraph is also a waiver provision, waiver of right of appeal from – waiver of right of collateral attack. That paragraph is talking about a legal proceeding that could be filed here in the trial court following your sentence. It's usually done by what's called a petition for writ of habeas corpus. In such a proceeding a person could claim that there was something unlawful or unconstitutional about the process involved in their case or the sentence itself. That again could include a claim that the person [sic] not been effectively represented by their attorney. In this paragraph you're giving up the right to do that period. Do you understand the complete nature of that waiver?

* * *

A: Yes, sir.

Q: Any questions?

* * *

A: No.

Q: The next section is entitled "Advisory Sentencing Guidelines" and that goes from paragraph 15, 16, 17, 18, 19 all the way through paragraph 20. Take a minute and look at that. Tell me when you're done and I'll ask you if you have any questions. Any questions through paragraph 20?
. . . If you're not through, that's fine. Keep going. Any questions about that section?

A: No. No.

* * *

Q: Paragraph 28 is the factual basis . . . . This paragraph purports to contain the details of your criminal conduct here. It goes on for quite a long time, three, four, five pages. Again, this is a very important paragraph, so I want you to read it carefully again, be sure that it's accurate, because when you tell me you have read it I'm going to ask you is this an accurate statement of what you did here, okay? Have you finished reading that? . . . Mr. Lee, is this an accurate statement of what happened?

A: Yes, sir.

* * *

Q: Have I accurately described the terms of the agreement?

A: Yes, sir.

Q: Has anyone made any other or different promise or assurance of any kind to you in an effort to induce you to plead guilty in this case?

* * *

A: No, sir.

Q: Has anyone attempted in any way to force you to plead guilty?

* * *

A: No, sir.

Q: Are each of you pleading guilty in this case because you are guilty?

* * *

A: Yes, sir.

* * *

Q: Have you and your attorneys talked about how the sentencing guidelines might apply to your cases?

* * *

A: Yes, sir.

Q: Do you understand that the Court will not be able to determine the advisory guideline range for your case until after the pre-sentence report has been completed and you and the Government have had an opportunity to challenge the reported facts and the application of the guidelines recommended by the probation officer and that the sentence imposed may be different from any estimate your attorney may have given you up to this point? Do you understand?

* * *

A: Yes, sir.

* * *

Q: Mr. Taylor, what's the worst case scenario that you have discussed with your client concerning the guidelines?

A: [By Mr. Taylor] Understood, Your Honor. Worst case scenario – worst case scenario would be level 38, criminal history category of either V or VI, and it would be 350 months to life under either one of those categories.

Q: Is that correct? Have you had that discussion?

- 10 -

A: [By Mr. Lee] Yes, sir.

* * *

Q: Count 1 of the indictment charges the crime of drug trafficking conspiracy. It alleges that from at least 2002 continuing through the present, at least during the time of the indictment, which was, looks like, May 22 of 2008, that the two of you did knowingly conspire, combine and agree with each other and others to commit certain acts in violation of the laws of the United States; that is, to knowingly possess with intent to distribute and to distribute a mixture and substance containing cocaine base crack, a Schedule II controlled substance. Count 1 charges that the conspiracy involved more than 50 grams of a mixture and substance containing cocaine base crack.

In paragraph 3 of Count 1, that discusses – it sets out a number of overt acts. That is, it's claimed that in furtherance of the conspiracy and to accomplish its unlawful purposes that you did commit overt acts, including but not limited to what is set out in the indictment.

What they set out in the indictment is that during the period of the conspiracy various persons would obtain cocaine base crack, would package the cocaine base crack for resale, would distribute the crack, would collect money from the sales of cocaine and crack, would possess firearms in furtherance of the drug trafficking activities, that various persons possessed U.S. currency for use in drug trafficking operations, that various people used telephones to conduct drug trafficking business, that during the period of the conspiracy Carlos Williams and Tiffany Edwards supplied cocaine base crack to various member of the conspiracy.

The word "knowingly" in this charge is defined as meaning that your conduct was voluntary, that you understood what you were doing, that your conduct was not the result of ignorance, mistake or some other innocent reason. Do . . . you understand that?

* * *

A: Yes, sir.

Q: This phrase "possess with intent to distribute" or "distribute", the word "distribute" there means that it was your intention to

transfer possession of this crack cocaine to other persons. That would typically occur by gift or by sale. Do you understand that definition?

* * *

A: Yes, sir.

Q: Any questions concerning what you're charged with in Count 1?

* * *

A: No, sir.

Q: Count 5 charges that on about March 15 of 2008, in this federal district, that the two of you did knowingly distribute more than 5 grams of a mixture and substance containing cocaine base crack, a Schedule II controlled substance. Any questions concerning what you're charged with there?

* * *

A: No, sir.

* * *

Q: Then I need to talk to you about what happened here to satisfy myself that you are in fact guilty as charged.

* * *

Mr. Lee, when did you join this conspiracy? All the way back in 2002 or at some point after that?

A: Sometime before that.

Q: Before that? Okay. You were also a member of the Black Peastone street gang?

A: Yes, sir.

Q: I think it says in yours that you were actually a general. Is that correct?

A: At one point.

Q: So what was your role in this conspiracy?

A: About the same.

Q: About the same?

A: Yes.

Q: Would you come into possession of amounts of crack cocaine from time to time?

A: Yes.

Q: What would a typical amount be?

A: More than 50 grams.

Q: More than 50 grams? Is that something that happened with regularity? Did that happen often or how often did it happen?

A: I can't recall at this time. It was just – you know, it was –

Q: Like once a week, once a month?

A: Something like that. I can't recall exactly times.

Q: But it's something that happened on a number of occasions?

A: Yes, sir.

Q: Where would that happen?

A: In Peoria.

Q: What would you do with the drugs then after they came – it was already crack when you got it?

A: Mostly. Most of the time. Sometimes.

Q: All right. When it was powder, did you have somebody cook it?

A: No, sir.

Q: And what would a typical amount be that you would distribute?

A: Probably like 50 grams somewhere at a time.

Q: What would you get paid for that?

A: Not at a time, but probably like – just probably like 14, 28.

Q: That happened several times?

A: Yes, sir.

Q: Is it fair to say that the conspiracy involved more than 50 grams of crack cocaine?

A: Yes, sir.

Q: In terms of your own personal involvement?

A: Yes, sir.

Q: Concerning Count 5, which is the incident from March 15 of 2008, were you also personally involved in that transaction?

A: Yes, sir. I was there.

Q: And was Mr. McKinney with you at that point?

A: Yes.

Q: Who actually had the drugs?

A: He had it on him.

Q: How much was involved in that? Was it more than 5 grams?

A: Yeah.

Q: And who did he give the drugs to?

A: I can't remember who is was that got in the car that day.

Q: Was it like a CS, a confidential source?

A: Yes, sir.

Q: Didd you know that this substance was crack cocaine?

A: Yes.

* * *

Q: How do . . . you plead to the charge of conspiracy to possess with intent to deliver and to deliver more than 50 grams of a mixture and substance containing a detectable amount of cocaine base crack as charged in Count 1 of the indictment, guilty or not guilty?

* * *

A: Guilty.

Q: How do . . . you now plead to the charge of delivery of more than 5 grams of crack cocaine as alleged in Count 5 of the indictment, guilty or not guilty?

* * *

A: Guilty.

Q: It is the finding of the Court in the case of United States of America vs. Taurus McKinney and Ronald Lee that each defendant is fully competent and capable of entering informed pleas, that each defendant is aware of the nature of the charges and the consequences of the plea and that the please of guilty are knowing and voluntary pleas supported by an independent basis in fact containing each of the essential elements of the offense. The please are, therefore, accepted and each defendant is not adjudged guilty of Count 1 and Count 5.

(Change of Plea Transcript at 5 -36.)

Then, at the March 6, 2009, sentencing, the following dialog occurred:

Q: At the time you entered your plea, you told me that you understood that, pursuant to the terms of the plea agreement, that with two very narrow exceptions you were giving up your right to appeal, and you were totally giving up your right to collaterally attack your sentence.

Nonetheless, I advise you that to the extent to which you feel you have any appeal rights that survive that waiver and it is your wish to appeal that any notice of appeal must be filed with the clerk of the court within ten days of today's date. As your attorney, Mr. Taylor has an absolute responsibility to file that notice for you if that is your wish.

- 15 -

Do you understand?

A: Yes, sir.

(Sentencing Transcript at 49-50)

The Court finds that nothing in the record even remotely suggests that Lee did not knowingly and voluntarily enter the plea agreement, including the waiver provisions contained therein. To the contrary, it clearly indicates that he expressly waived his rights to appeal and pursue collateral relief on more than one occasion after extensive questioning and explanation by the Court. Thus, the record also demonstrates that the Court provided him with a lengthy and detailed explanation of the waiver provisions that was more than adequate to supplement or correct any lack of information or misinformation that may have been provided by counsel. After receiving this explanation, Lee proceeded to state on more than one occasion that he was acting voluntarily and understood everything as it had been explained to him by the Court.

Therefore, regardless of his current protestations that counsel was less than diligent in his representation and provided ineffective assistance, the record before the Court unequivocally demonstrates that Lee acted knowingly and freely in entering into the plea agreement, including the waiver provisions. Had he truly not wished to plead guilty, not understood the proceedings in which he participated, or been caught unaware by the waiver provisions, it would seem only reasonable that he would have made some attempt to correct the factual record or bring his plight to the attention of the Court.

Lee has failed to demonstrate that ineffective assistance of counsel negated the knowing or voluntary nature of his plea or the waiver itself, that the waiver was a product of coercion, or that the trial court relied on some constitutionally impermissible

factor, such as race, in imposing sentence. Accordingly, the Court now holds that Lee's waiver of his right to pursue collateral relief was both knowing and voluntary and operates to bar him from pursuing further habeas corpus relief, and this § 2255 Motion is therefore frivolous. *See* United States v. Richardson, 1998 WL 388590, at *3 (E.D.La. July 9, 1998) (finding that defendant's claims under § 2255 that his plea was involuntary and that the government had not met its burden of proving he possessed crack cocaine were barred by a valid waiver in his plea agreement).

2. Certificate of Appealability

To obtain a certificate of appealability (CA), a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C § 2253(c)(2). The petitioner must also show that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." Id.

Here, no reasonable jurist could conclude that Lee did not knowingly and voluntarily plead guilty pursuant to a plea agreement that contained waivers of both appeal rights and the right to collaterally attack his conviction or sentence. As a result, such claims are clearly barred from further pursuit in a collateral attack. Accordingly, this Court will not issue him a certificate of appealability.

**CONCLUSION**

For the reasons set forth herein, the Court cannot find that there has been any credible showing that but for the alleged unprofessional errors of counsel, there is any

reasonable probability that the result of this proceeding would have been different, as the record clearly demonstrates that Lee knowingly, intelligently, and voluntarily pled guilty and waived his right to bring both an appeal and collateral attack on his conviction and sentence. Accordingly, Petitioner's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody pursuant to 28 U.S.C. § 2255 [#4] is DISMISSED, and the Court declines to issue a Certificate of Appealability. This matter is now terminated.

ENTERED this 29th day of October, 2010.


s/ Michael M. Mihm
Michael M. Mihm
United States District Judge